**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**LIBERTARIAN PARTY OF OHIO,**
**KEVIN KNEDLER, BOB BARR,**
**WAYNE A. ROOT, MARK NOBLE**
**and MARGARET A. LEECH,**

                **Plantiffs,**

**v.**

**JENNIFER BRUNNER, in her**
**Official Capacity as Ohio Secretary**
**of State,**

                **Defendant.**
_____/

**Case No. 08-555**

**JUDGE SARGUS**

**MAGISTRATE JUDGE KING**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

      The plaintiffs are an alternative political party (the "LPO") and several of its candiates for public office. They would like to run the individual candidate-plaintiffs and other candidates for public office in the November 2008 general election on the Libertarian Party line. The defendant has denied them access to the ballot.

      Were it not for the Sixth Circuit's decision in Libertarian Party of Ohio v. Blackwell, 462 F.3d 579 (6th Cir. 2006), the plaintiffs would have had to qualify for the November 2008 ballot by obtaining petition signatures of Ohio electors equal in number to at least one percent of the votes cast for governor in the 2006 general election, or 40,227 signatures; by filing such petition signatures with defendant at least 120 days before the March 4, 2008 primary election; and by nominating their candidates at the March 4, 2008 primary election. Ohio Rev. Code §§ 3501.01(F)(3), 3517.021 and 3501.01(E); Defendant's Directive 2007-09, Complaint, Ex. B.

1

However, in Blackwell the Sixth Circuit ruled that Ohio's requirement that political parties nominate their candidates via primary election, together with its requirement that minor parties file a qualifying petition 120 days in advance of the primary election, impose "... an unconstitutional burden on [the LPO's] First and Fourteenth Amendment rights of free association, by effectively preventing it from gaining access to the general election ballot in the twelve months preceding a presidential election." 462 F.3d at 582.

In the absence of any remedial legislation to fill the post-Blackwell void in minor party qualifying procedures, defendant promulgated a Directive which purports to require a minor party desirous of fielding candidates in the November 2008 general election to obtain petition signatures equal in number to one-half of one percent of the 2006 gubernatorial vote and to file them at least 100 days before the March 4, 2008 primary election. Directive 2007-09, May 21, 2007, Complaint, Ex. B. The Directive leaves intact the pre-Blackwell requirement that a minor party nominate its candidates by primary election.

On March 3, 2008 plaintiffs sought to qualify the LPO for the November 2008 general election ballot by filing a petition containing some 6,545 signatures. By letter dated May 22, 2008 defendant rejected the petition for failure to comply with Directive 2007-09. Complaint, Ex. A. Plaintiffs now seek a preliminary injunction ordering defendant to grant plaintiffs access to the November 4, 2008 ballot and prohibiting defendant from enforcing the ballot access restrictions contained in Directive 2007-09.

**ARGUMENT**

## I.    THE STANDARDS FOR A PRELIMINARY INJUNCTION

To determine whether plaintiffs are eligible for a preliminary injunction, the Court must

2

balance four factors: (1) the likelihood that plaintiffys will succeed on the merits; (2) whether

plaintiffs will suffer irreparable harm without the injunction; (3) the probability that granting the

injunction will cause substantial harm to others; and (4) whether the public interest is advanced

by the issuance of the injunction.  Washington v. Reno, 35 F.3d 1093, 1099 (6th Cir. 1994).

## II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

In demonstrating that they are likely to succeed on the merits, plaintiffs need not show a

strong likelihood nor even a substantial likelihood of success; they need only show that the

merits of the case present a sufficiently serious question to justify further investigation of the

merits.  In re DeLorean Motor Co., 755 F.2d 1223, 1230 (6th Cir. 1985).

### A.  THE DENIAL OF BALLOT ACCESS IS UNCONSTITUTIONAL UNDER LIBERTARIAN PARTY OF OHIO V. BLACKWELL

Plaintiffs submit that the Sixth Circuit's decision in Libertarian Party of Ohio v.

Blackwell, supra, is controlling precedent.  In Blackwell the court struck down as

unconstitutional the combination of Ohio's requirements that a minor party such as the LPO

nominate its candidates via primary election and that it qualify for the general election ballot by

filing petition signatures, at least 120 days in advance of the primary, equal in number to one

percent of the vote for governor or for presidential electors at the previous general election.

Here, the defendant has left intact the requirement that minor parties nominate via

primary election and has substituted for the previous one-percent petition a one half-percent

petition, to be filed 100 days before the primary instead of 120 days beforehand.  These new

requirements do not adequately address the Sixth Circuit's concerns in Blackwell.

The individual plaintiffs were nominated for public office by party convention.

Complaint, ¶¶ 10 - 12.  On March 3, 2008 the plaintiffs demonstrated that the LPO enjoys a

3

substantial modicum of public support in Ohio by tendering some 6,545 petition signatures to defendant. Complaint, ¶ 21 and Ex. A. In prior cases where courts have invalidated state ballot access frameworks, non-major party candidates have been granted access to the ballot without having filed any petition signatures. See, e.g., McCarthy v. Briscoe, 429 U.S. 1317 (1976);; McCarthy v. Askew, 540 F.2d 1254 (5th Cir. 1976); McCarthy v. Slater, 553 P.2d 489 (Sup. Ct. Okla. 1976); Goldman-Frankie v. Austin, 727 F.2d 603 (6th Cir. 1984); Hall v. Austin, 495 F. Supp. 782 (E.D. Mich. 1980).

Plaintiffs' demonstrate below that their First Amendment speech and associational rights are violated by defendant's rejection of the LPO petition, by Ohio's early filing deadline for minor party qualifying petitions, and by Ohio's mandatory primary requirement. The petition rejection, filing deadline and mandatory primary are unconstitutional because the burdens they impose on plaintiffs' constitutional rights cannot be justified by a sufficient state interest.

## B. PLAINTIFFS' RIGHTS OF POLITICAL SPEECH AND ASSOCIATION HAVE BEEN VIOLATED

The administration of the election process is largely entrusted to the states; however, they may not infringe on basic constitutional protections. Kusper v. Pontikes, 414 U.S. 51, 57 (1974), citing Dunn v. Blumstein, 405 U.S. 330 (1972).

Williams v. Rhodes, 393 U.S. 23, 30 (1968) (holding that Ohio's election laws making it virtually impossible for a minor party to access the presidential election ballot were unconstitutional), the first case in which the Supreme Court addressed the constitutional status of state ballot access restrictions, considered the nature of the rights implicated by such restrictions. The Court noted that such restrictions

> place burdens on two different, although overlapping, kinds of rights -- the right of
> individuals to associate for the advancement of political beliefs, and the right of qualified

4

voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.

Many ballot access restrictions are, of course, justified by the state's legitimate regulatory interests. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Storer v. Brown, 415 U.S. 724, 730 (1974).

The Supreme Court has described the trial court's task in evaluating a constitutional challenge to a state-imposed restriction on access to the ballot as follows:

> It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged [restriction] is unconstitutional.

Anderson v. Celebrezze, 460 U.S. 780, 789 (holding that Ohio's March filing deadline for independent presidential candidate petitions was unconstitutionally burdensome).[1]

In a subsequent ballot access decision, Burdick v. Takushi, 504 U.S. 428, 433-34 (1992) (upholding Hawaii's prohibition against write-in voting in the context of a regulatory framework providing for easy access to the ballot) the Supreme Court endorsed the Anderson methodology and examined the circumstances in which different levels of scrutiny should be applied, stating:

_____

[1]The Anderson Court based its analysis on the First and Fourteenth Amendments generally and did not explicitly engage in a separate equal protection analysis. The Court stated, however, that it "rel[ied] ... on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment," Id. at 786 n. 7, and indicated that those cases had been correctly decided. The earlier cases referred to by the Court all employed traditional equal protection analysis but with varying levels of scrutiny. See Williams v. Rhodes, supra; Jenness v. Fortson, 403 U.S. 431 (1971); Storer v. Brown, 415 U.S. 724 (1974); American Party of Texas v. White, 415 U.S. 767 (1974), rehearing denied, 417 U.S. 926; Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173 (1979)

5

Election laws will invariably impose some burden upon individual voters. Each provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects -- at least to some degree -- the individual's right to vote and his right to associate with others for political ends [citing <u>Anderson</u> at 788]. Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently.

Under [the "more flexible standard" applied in <u>Anderson</u>], the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." <u>Norman v. Reed</u>, 502 U.S. ___, ___, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions [citing <u>Anderson</u> at 788] ....

The <u>Anderson</u> approach, as informed by <u>Burdick</u>,, has been characterized as "a balancing test that ranges from strict scrutiny to a rational-basis analysis, depending upon the factual circumstances in each case." <u>Duke v. Clelland</u>, 5 F.3d 1399, 1405 (11th Cir. 1993), citing <u>Fulani v. Krivanek</u>, 973 F.2d 1539, 1543 (11th Cir. 1992).

Here, plaintiffs employ the <u>Anderson</u>/<u>Burdick</u> form of analysis by evaluating the injuries to plaintiffs' constitutional rights caused by the ballot access restrictions about which they complain; the state interests that could be asserted to justify those injuries; and in light of these considerations, the constitutionality of the restrictions.

## 1. THE INJURIES TO PLAINTIFFS' RIGHTS ARE SEVERE

Plaintiffs' First and Fourteenth Amendment rights to cast their votes effectively and to associate for the advancement of political ideas, including their right to form and develop a new ballot-qualified party, have been seriously impaired. Foreclosing plaintiff LPO from the ballot unnecessarily limits the choices available to LPO voters and undermines the development of the

6

party.

The plaintiffs in this action assert the "different, although overlapping kinds of rights," cf.

Williams v. Rhodes, supra at 30, of minor parties, their candidates, and their voter-supporters.

Their rights to associate for the advancement of political ideas and to cast their votes effectively

in furtherance of those ideas are among the most fundamental in our society. By foreclosing the

LPO from access to the ballot the defendant, together with the requirements of Ohio election

law, have thoroughly undermined the First and Fourteenth Amendment rights of all three

categories of plaintiffs.

As for the rights of the LPO's voter-supporters, the Supreme Court observed in Anderson

at 787-88 that

> voters can assert their preferences only through candidates or parties or both. "It is to be
> expected that a voter hopes to find on the ballot a candidate who comes near to reflecting
> his policy preferences on contemporary issues." [Citation omitted.] The right to vote is
> "heavily burdened" if that vote may be cast only for major-party candidates at a time
> when other parties or other candidates are "clamoring for a place on the ballot."
> [Citations omitted.] The exclusion of candidates also burdens voters' freedom of
> association, because an election campaign is an effective platform for the expression of
> views on the issues of the day, and a candidate serves as a rallying point for likeminded
> citizens.

Perhaps the most important right at stake in this litigation is the right to develop new

political parties such as the LPO. The Supreme Court has made it plain that the right of political

association encompasses a constitutional right to develop new parties:

> For more than two decades, this Court has recognized the constitutional right of citizens
> to create and develop new political parties. The right derives from the First and
> Fourteenth Amendments [footnote omitted] and advances the constitutional interest of
> likeminded voters to gather in pursuit of common political ends, thus enlarging the
> opportunities of all voters to express their own political preferences. [Citations omitted.]
> To the degree that a State would thwart this interest by limiting the access of new parties
> to the ballot, we have called for the demonstration of a corresponding interest sufficiently
> weighty to justify the limitation [citing Anderson], and we have accordingly required any
> severe restriction to be narrowly drawn to advance a state interest of compelling

7

importance ....

Norman v. Reed, 502 U.S. 279, 288-89 (overturning decision of Illinois Supreme Court which,

inter alia, had upheld an Illinois law requiring more petition signatures for a new party to access

a countywide ballot than were required to access the statewide ballot).

In determining the severity of the burden which a ballot access restriction imposes, a

court must consider the restriction in the context of the totality of the state's restrictions on access

to the ballot. Williams v. Rhodes, supra, at 32. The severity of the injuries to the instant

plaintiffs' rights, together with the Supreme Court's decision in Norman v. Reed, supra, mean

that the standard of review to be applied here is strict scrutiny; the state must demonstrate that

the restrictions at issue are "... narrowly drawn to advance a state interest of compelling

importance." Id. at 289.

## 2. THE STATE INTERESTS LIKELY TO BE PUT FORWARD ARE INSUFFICIENT

Under the Anderson/Burdick test, "[o]nce a plaintiff has identified the interference with

the exercise of her First Amendment rights, the burden is on the state to 'put forward' the 'precise

interests' ... [that are] justifications for the burden imposed by its rule." Fulani v. Krivanek, supra

at 1544, citing Anderson at 789.

Close analysis of whatever state interests the defendant may assert in her answering

papers must necessarily be undertaken in plaintiffs' reply papers. However, it can be anticipated

that the defendant, on behalf of the State of Ohio and in support of the ballot access restrictions

complained of, will put forward Ohio's interest in ensuring the integrity and orderly

administration of its electoral process; its interest in requiring parties "to make a preliminary

showing of substantial support in order to qualify for a place on the ballot, because it is both

8

wasteful and confusing to encumber the ballot with the names of frivolous candidates" Anderson at 789 n. 9; its interest in administering the election processes as it sees fit, which allegedly includes requiring parties to nominate by primary; and its derivative right to require that minor party qualifying petitions be filed far enough in advance of the primary to enable defendant to verify petition signatures and prepare ballots.

### 3. THE STATE'S INTERESTS DO NOT JUSTIFY THE EARLY PETITION FILING DEADLINE

Defendant set the deadline for filing minor party qualifying petitions at 100 days before the March 4, 2008 primary election, i.e., November 26, 2007. Directive 2007-09, May 21, 2007, Complaint, Ex. B.

Plaintiffs assert that the filing deadline is unconstitutionally early. Had it been set reasonably in advance of the November 2008 general election, plaintiffs might have elected to comply with it, and defendant would still have had ample time to verify petition signatures and print ballots.

Upon information and belief, Ohio is one of only two states that have a qualifying deadline for minor parties in the year preceding the election year for which such parties seek to qualify for the ballot, Blackwell at 589, and no court has ever upheld a filing deadline set in the year preceding the election year. Upon information and belief, the earliest mandatory filing deadline ever upheld by a court is a North Dakota deadline set in mid-April of the election year. McLain v. Meier, 851 F.2d 1045 (8th Cir. 1988) (upholding mid-April deadline which resulted from state moving its primary to an earlier date, where state had also lowered the signature requirement).

Note that the filing deadline in the Ohio ballot access framework invalidated by the

Supreme Court in <u>Williams v. Rhodes</u>, <u>supra</u> at 33, was set in February of the election year. Note also that the Ohio filing deadline which the Supreme Court struck down as unconstitutionally early in <u>Anderson v. Celebrezze</u>, <u>supra</u> at 782, was set in March of the election year.

Before the Sixth Circuit's decision in <u>Libertarian Party of Ohio v. Blackwell</u>, <u>supra</u>, the early filing deadline was a function of Ohio Rev. Code § 3517.012, which effectively required that a qualifying petition be filed at least 120 days before the next primary election, and of Ohio Rev. Code § 3501.01(E), which requires primary elections in presidential election years to be held in early March. However, it appears that Ohio's choices post-<u>Blackwell</u> are to hold its presidential-election-year primaries on a significantly later date or to waive the requirement that minor parties nominate by primary.

### 4.  THE STATE'S INTERESTS DO NOT JUSTIFY REQUIRING THE LPO TO NOMINATE VIA PRIMARY ELECTION

The Supreme Court recognized the right of a state to require parties to nominate by primary in <u>California Democratic Party v. Jones</u>, 530 U.S. 567, 572 (2000) (holding unconstitutional a California proposition that changed the state's primary election from a closed primary to a blanket primary in which a voter could vote for any candidate irrespective of the voter's or candidate's party affiliation, where the political party-plaintiffs did not want nonmenbers to participate in the selection of their candidates), stating:

> We have considered it "too plain for argument" ... that a State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion. [Citations omitted.]

The <u>Jones</u> Court was not presented with an opportunity to explore the circumstances in which a state's right to require primaries might have to yield to counterveiling rights, such as a

party's right to govern itself as it sees fit. See, e.g., Eu v. San Francisco County Democratic Central Committee, 489 U.S. 214 (1989) (holding unconstitutional several California statutes prohibiting party governing bodies from endorsing or opposing candidates in primaries; prescribing how party governing bodies shall be organized and composed; restricting the term of office for party chairs; and requiring that party chairs alternate between residents of northern and southern California).

In the case at bar, as explained above, Ohio's March primary results in an unconstitutionally early petition filing deadline. Ohio may constitutionally exercise its right to require parties to nominate by primary only if holds its primary at a later date. It might be worth noting that Ohio appears to be one of only seven states that require a newly-qualifying party to nominate its candidates by primary as a condition for having them listed on the November ballot with the party's label. The other six such states (California, Hawaii, Mississippi, North Dakota, Oklahoma and Tennessee) either have significantly easier qualification requirements for minor parties than Ohio's or have significantly later primary elections than Ohio's, which results in significantly later deadlines for filing a petition or otherwise complying with party-qualification requirements.

### 5. ARTICLES I AND II OF THE UNITED STATES CONSTITUTION PROHIBIT DEFENDANT FROM PASSING LAWS REGULATING FEDERAL ELECTIONS

Section 4 of Article I of the United States Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof …." U.S. Const., art. I, § 4 cl. 1. Section 1 of Article II, meanwhile, provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof

**11**

may direct, a Number of Electors" to vote for President. U.S. Const., art. II, § 1, cl. 2. Together, these Elections Clause provisions dictate that only Ohio's *legislature* can prescribe the manner of electing federal Representatives and Senators, as well as the President of the United States. Ohio's Secretary of State does not and cannot have that power.

This issue arose in Bush v. Gore, 531 U.S. 98 (2000), where the Court ultimately ruled that Florida's method of counting votes for President violated the Equal Protection Clause of the federal Constitution. In the lead-up to that decision, the Supreme Court in Bush v. Palm Beach County Canvassing Board, 531 U.S. 70 (2000), first addressed whether the Florida Supreme Court's interpretation of Florida's election laws strayed beyond what Article II, § 1 allowed. "As a general rule," it stated, "this Court defers to a state court's interpretation of a state statute. But in the case of a law enacted by a state legislature applicable not only to elections to state offices, but also to the selection of Presidential electors, the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." Id. at 76. Because it was "unclear as to the extent to which the Florida Supreme Court saw the Florida Constitution as circumscribing the legislature's authority under Art. II, § 1, cl. 2," Id. at 78, the Court accordingly vacated the Florida Supreme Court's interpretation of the election code and remanded for further proceedings. Id.

When the case returned to the Supreme Court, the Chief Justice, joined by Justices Scalia and Thomas, concurred in the result – reversing the Florida Supreme Court's "count every vote" remedy – but added another reason for striking down the Florida Supreme Court's scheme. The Chief Justice concluded that the Florida Supreme Court violated Article II, § 1 by deviating from

the directions of the Florida legislature: "[In] a Presidential election, the clearly expressed intent of the legislature must prevail." Id. Because the meaning of Article II presented a federal question, the Chief Justice found that he did not have to defer to the Florida Supreme Court's interpretation of state law. Id.

The Chief Justice in Bush v. Gore relied on McPherson v. Blacker, 146 U.S. 1 (1892), for the proposition that Article II delegates regulatory power over Presidential elections to the states' *legislatures*, not their courts. "In McPherson v. Blacker, 146 U.S. 1 (1892), we explained that Art. II, § 1, cl. 2, 'convey[s] the broadest power of determination' and 'leaves it to the legislature exclusively to define the method' of appointment. A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." 531 U.S. at 113. He concluded that "in a Presidential election the clearly expressed intent of the legislature must prevail. And there is no basis for reading the Florida statutes as requiring the counting of improperly marked ballots ...." Id. at 121.

The same issue recently arose in the context of congressional elections in Lance v. Coffman, 127 S.Ct. 1194 (2007), where a state court drew Colorado's congressional districts in the absence of a legislative plan. Not long after the state court's action, the legislature passed a new plan, which was duly challenged before the Colorado Supreme Court. Those favoring the judicial plan argued that Colorado's constitution prohibited a mid-census apportionment. Those who supported the legislative plan argued that Art. I, § 4 of the federal Constitution precluded a state court from drawing districts for congressional elections. The Colorado Supreme Court ruled in favor of the judicial plan in People ex rel. Salazar v. Davidson, 79 P.3d 1221, 1231 (2003) (en banc). Specifically, it found that judicial apportionment did not offend the Elections

Clause of Art. I, § 4 of the United States Constitution. Id. at 1231.

Following the dismissal of a collateral challenge filed by voters in federal court, the Supreme Court was asked in Lance v. Coffman, supra, to overturn the state court's apportionment plan. The Supreme Court, however, was prevented from reaching the merits of the Elections Clause question by the plaintiffs' lack of standing. Id. at 1198.

Lance v. Coffman demonstrates that the defendant's Directive presents a serious federal constitutional question under Articles I and II. Although the Court in Coffman did not reach the merits, it most assuredly would have ruled in favor of the Colorado legislature if it had. The Court, after all, has made it clear on a number of occasions that the federal Constitution's use of the term "State Legislature" means exactly that. It does not mean "legislative power," nor does it countenance "legislative delegation." The Framers in 1787 were not familiar with the modern administrative state's frequent delegation of legislative power. They could not have imagined a legislature's awarding executive agents lawmaking authority. Thus, notwithstanding more modern understandings of lawmaking power – which include easy recognition of "quasi-legislation" passed by administrative agencies – Articles I and II of the United States Constitution continue to command action by a State's Legislature.

Justice Stevens (joined by Justice Ginsburg) recently made this point in California Democratic Party v. Jones, 530 U.S. 567, 602 (2000) (Stevens, J., dissenting), where the Court invalidated California's adoption of a "blanket primary" under the First Amendment. While Justice Stevens disagreed with the majority over its application of the First Amendment, he agreed that the law was likely invalid. This was so, he argued, because the blanket primary – which was also applied to congressional elections – was adopted by popular initiative, rather

**14**

than by the California legislature: "Although this distinction is not relevant with respect to elections for state offices, it is unclear whether a state election system not adopted by the legislature is constitutional insofar as it applies to the manner of electing United States Senators and Representatives." Id. at 602.

Justice Stevens, moreover, balked at the suggestion that Art. 1, § 4 necessarily receives the State's Legislature as created by the State's Constitution, which "provides that '[t]he legislative power of this State is vested in the California Legislature ..., but the people reserve to themselves the powers of initiative and referendum.'" Id. at 602-03. "The vicissitudes of state nomenclature," he responded, "do not necessarily control the meaning of the Federal Constitution." Id. at 603. "Moreover, the United States House of Representatives has determined in an analogous context that the Elections Clause's specific reference to 'the Legislature' is not so broad as to encompass the general 'legislative power of this State.'" Id.[2] "California's classification of voter-approved initiatives as an exercise of legislative power," Justice Stevens explained, "would not render such initiatives the act of the California Legislature within the meaning of the Elections Clause." Id.

Although Justice Stevens did not decide the issue because it was not fully raised by the parties, the Supreme Court has addressed the matter in a slightly different context. In Hawke v. Smith, 253 U.S. 221 (1920), the Supreme Court rejected Ohio's claim that the ratification of a proposed federal Constitutional amendment by the Ohio legislature was subject to the popular

---

[2] Justice Stevens cited to Baldwin v. Trowbridge, 2 Bartlett Contested Election Cases, H.R. Misc. Doc. No. 152, 41st Cong., 2d Sess., 46, 47 (1866), which reported that the Elections Clause "power is conferred upon the *legislature*. But what is meant by 'the legislature?' Does it mean the legislative power of the State, which would include a convention authorized to prescribe fundamental law; or does it mean the legislature *eo nomine*, as known in the political history of the country? The [C]ommittee [of Elections for the U.S. House of Representatives] have adopted the latter construction."

15

referendum process applied to all other laws.  Article V of the United States Constitution provides that amendments proposed by the Congress can either be ratified by state conventions or legislatures: "The method of ratification is left to the choice of Congress."  Id. at 226. Regardless, the Court observed in Hawke, "[b]oth methods of ratification, by Legislatures or conventions, call for action by deliberative assemblages representative of the people, which it was assumed would voice the will of the people."  Id. at 226-27.  The Court specifically rejected the claim that "the federal Constitution requires ratification by the legislative action of the states through the medium provided at the time of the proposed approval of an amendment." Id. at 229.  "This argument is fallacious in this – ratification by a state of a constitutional amendment is not an act of legislation within the proper sense of the word.  It is but the expression of the assent of the state to a proposed amendment."  Id.  Thus, ratification must be by a State's legislature, and the legislature alone.  It cannot be by referendum and cannot be delegated to an agency.

Whether this logic applies to Articles I and II as well as Article V was answered by the Hawke Court's use of the Seventeenth Amendment to support its conclusion.  As explained in Hawke, see 253 U.S. at 228, the Seventeenth Amendment – which provides for the popular election of Senators – was  necessary for the very reason that Article I, § 3 required that a State's Senators be "chosen by the Legislature thereof …."  U.S. Const., art. I, § 3, cl. 1.  Because the Constitution delegated to the states' legislatures the power of selecting Senators, the legislatures could not delegate this power to the people.  A Constitutional Amendment was necessary to achieve this result.  And just as the state's legislature cannot delegate its power to regulate

16

federal elections directly to the people,[4] it cannot delegate this power to an executive agency like the Secretary of State.[5]

### 6. OHIO'S LEGISLATURE HAS NOT CLEARLY DELEGATED THE AUTHORITY TO REGULATE FEDERAL ELECTIONS TO DEFENDANT.

Assuming that a delegation of rulemaking power in this context can somehow survive Articles I and II of the United States Constitution, it would seem reasonable to demand clarity in the delegation. And in the present case, there is absolutely no suggestion that Ohio's Legislature asked Brunner to fill any void in Ohio's election laws. Indeed, longstanding practice has it that the Secretary of State has no power to "amplify" the state's election laws. In a 1930 response to Ohio's Secretary of State, Attorney General Gilbert Bettman stated that while the "Legislature has manifestly left to the discretion of the Secretary of State as chief election officer the determination of certain *details which it cannot foresee* and determine in the administration of the election laws," this power can only be exercised "*so long as the laws were not thereby amplified* ...." 1930 Ohio A.G. Op. 120, 122-23 (emphasis added). Ohio law thus generally

---

[4]  In State of Ohio ex rel. Davis v. Hildebrandt, 241 U.S. 565 (1916), the Court sustained Ohio's application of its referendum mechanism to a legislatively drawn congressional districting plan. In contrast to Hawke and the present case, however, Congress there had expressly authorized the application of referenda mechanisms to congressional districting plans. Because Congress has the power under Art. I, § 4 to draw rules for electing federal representatives, Congress's action legitimated what otherwise would have been deemed unconstitutional under Art. I, § 4. There is no suggestion in the present case that Congress has authorized a delegation of regulatory power over federal elections to the Ohio Secretary of State.

[5]  In Smiley v. Holm, 285 U.S. 355 (1932), the Supreme Court ruled that Art. I, § 4's reference to "Legislature" assumes the basic legislative processes spelled out by the state's fundamental charter. Hence, bicameralism in Ohio is required for the "Legislature" to act, and Ohio's gubernatorial veto can be constitutionally applied to the Legislature's proposed manner of electing federal representatives. Bicameralism and Presentment, after all, are fundamental aspects of legislative action. This is a far cry, however, from holding that the Legislature can delegate all of its authority to the Governor or some other executive agent.

17

provides two conditions for the Secretary to act in the context of elections: (1) she must be filling in unforeseeable details, and (2) she cannot be expanding or amplifying existing laws.

The defendant's Directive here satisfies neither condition. First, Ohio's legislature expressly addressed the qualification of minor parties. The matter was and remains wholly foreseeable. Second, far from filling in details, Brunner is amplifying law. Indeed, she is engaged in fundamental lawmaking. Even assuming this can be accepted in the context of local elections – and it is Plaintiffs contention that it cannot under General Bettman's interpretation of Ohio law – it cannot be tolerated for federal elections. The Constitution of the United States delegates to Ohio's Legislature the authority to regulate federal elections. Assuming that the Ohio Legislature can delegate this power to the Secretary, it must do so clearly. Here, it clearly has not.

## III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION

Elrod v. Burns, 427 U.S. 347, 373-74 (1975) made it clear that actual or threatened injury to First Amendment interests constitutes irreparable harm for preliminary injunction purposes. In that case the Court upheld the issuance of a preliminary injunction against patronage dismissals of Republican public employees by a Democratic official, at a point when the employees were discharged or threatened with discharge and members of the class they were seeking to have certified were threatened with discharge or had agreed to support the Democratic Party in order to avoid discharge. The Court stated:

> It is clear ... that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. See New York Times Co. v. United States, 403 U.S. 713 (1971). [Footnote omitted.]

**18**

Unless a preliminary injunction is issued in this case, plaintiff LPO will be forever deprived of the opportunity to have minor party status in 2008; the candidate-plaintiffs and others who are similarly situated will be forever deprived of the opportunity to run for office in 2008 on the Libertarian Party line; and the voter-plaintiffs and others who are similarly situated will be forever deprived of the opportunity to support and vote for the LPO and its candidates in 2008.

Plaintiffs submit that it is difficult to imagine injuries to First Amendment speech and associational rights which are more irreparable than those just described.

## IV.    GRANTING A PRELIMINARY INJUNCTION WILL NOT HARM ANYONE

Plaintiffs submit that no cognizable harm could be suffered by anyone by the Court's issuance of a preliminary injunction (1) directing defendant to accept the LPO petition or, in the alternative, invalidating the early filing deadline and (2) invalidating the mandatory primary requirement.  While the presence of LPO candidates on the ballot could conceivably produce different election results than would occur in their absence, the resulting "harm" to one or both of the major parties and their affected candidates is not the kind of harm that is cognizable by a court of law.

## V.    A PRELIMINARY INJUNCTION WOULD ADVANCE THE PUBLIC INTEREST

Defendant's rejection of the LPO petition, together with Ohio's early filing deadline and its mandatory primary requirement, operate in this instance to thwart the development of a new political party and to unnecessarily restrict the choices available to Ohio voters.  The public interest lies in more electoral choices and in the vindication of plaintiffs' rights to speak and associate politically.

## VI.    PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A SECURITY BOND

19

Although Fed.R.Civ.P. 65(c) would seem to condition the issuance of a preliminary injunction on the posting of a bond by plaintiffs, the Sixth Circuit has explained that whether to require a bond is within the discretion of the Court. See, e.g., Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171, 1176 (6th Cir. 1995). Plaintiffs urge that requring a bond would discourage public interest litigation such as the case at bar and would serve no useful purpose, since the granting of a preliminary injunction presents no risk of economic harm to the defendant.

**CONCLUSION**

For the foregoing reasons the Court is requested to enter a preliminary injunction (1) granting plaintiffs access to the November 4, 2008 general election ballot; (2) invalidating the early filing deadline for minor party qualifying petitions imposed by defendant; and (3) invalidating the requirement that the LPO nominate its candidates via primary election and permitting it to nominate by party caucus or convention. The Court is further requested to dispense with the requirement of a security bond.

Dated: June 16, 2008

Gary Sinawski
180 Montague Street 26th Floor
Brooklyn, NY 11201
Telephone: (516) 971-7783
Telefax: (212) 581-1516
E-mail: gsinawski@aol.com

s/*Mark R. Brown*
Mark R. Brown, Trial Counsel
Ohio Registration No. 0081941
303 East Broad Street
Columbus, OH 43215
Telephone: (614) 236-6590
Telefax: (614) 236-6956
E-mail: mbrown@law.capital.edu

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that the foregoing was delivered to Richard Coglianese, counsel for Defendant, via e-

mail and by the Court's electronic filing system.

*s/ Mark R. Brown*_____
Mark R. Brown

**21**