UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LIBERTARIAN PARTY OF OHIO,**
**KEVIN KNEDLER, BOB BARR,**
**WAYNE A. ROOT, MARK NOBLE**
**and MARGARET A. LEECH,**

        Plaintiffs,        Case No. 2:08-cv-555

v.        JUDGE SARGUS

**JENNIFER BRUNNER, in her**        MAGISTRATE JUDGE KING
**Official Capacity as Ohio Secretary**
**of State,**

        Defendant.

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

I. INTRODUCTION

In <u>Libertarian Party of Ohio v. Blackwell</u>, 462 F.3d 579 (6th Cir. 2006), the Sixth Circuit struck down as unconstitutional the combination of Ohio's requirements that a minor party such as the LPO nominate its candidates via primary election and that it qualify for the general election ballot by filing a petition at least 120 days in advance of the primary which contains a number of signatures equal to one percent of the vote for governor or for presidential electors in the preceding general election..

In Directive 2007-09, the defendant left intact the requirement that minor parties nominate via primary election, reduced the signature requirement by one-half, and set a new filing deadline of 100 days before the primary instead of 120 days beforehand. Amended Complaint, Ex. A.

1

Directive 2007-09 also provides a new mechanism by which nonmajor party candidates for president and vice president (only) can be listed on the general election ballot with a "party identifier" by submitting a petition that complies with the same signature and filing requirements. Id.; Defendant's Memorandum at 3.

These cosmetic changes in Ohio's ballot access requirements do not adequately address the Sixth Circuit's concerns in Blackwell.  Plaintiffs assert that the new requirements violate their First Amendment speech and associational rights and run afoul of Articles I and II of the United States Constitution, which prohibit defendant from passing laws regulating federal elections.

The issues presented to the Court are the extent to which these features of Ohio ballot access law burden plaintiffs' First and Fourteenth Amendment rights, the extent to which the burdens are justified by a sufficient state interest, and whether the requirements are unconstitutional in light of the burdens they impose and the state interests put forward to justify them.  Specifically, plaintiffs challenge Ohio's requirement that a petition to qualify a minor party in a presidential election year be filed in November of the year preceding the election rather than a reasonable time before the election and its requirement that a minor party nominate its candidates at the primary election held early in March rather than at a primary election, party convention or caucus held later in the year.  Plaintiffs also challenge the new mechanism by which nonmajor party candidates for president and vice president can attain access to the general election ballot with a party identifier.

Defendant's arguments in defense of these requirements rest on the untenable assumption that it is constitutionally permissible, in a presidential election year such as this, both to continue requiring that minor parties select their candidates in Ohio's March primary election and to continue linking the filing deadline for minor party qualifying petitions to the date of that primary

2

election. While this linkage may have an internal logic of its own, it was invalidated in <u>Blackwell</u> because it effectively prevented the LPO from attaining access to the Ohio ballot in the year preceding the general election.

## II. THE INTERESTS PUT FORWARD BY THE STATE TO JUSTIFY THE BURDENS ON PLAINTIFFS' RIGHTS

In justification of the burden on plaintiffs' First Amendment rights imposed by the requirements promulgated in Directive 2007-09, defendant points to its interests in reducing election- and campaign-related disorder, Defendant's Memorandum at 4; requiring that a political party or its candidate show a significant modicum of support as a precondition for ballot access, Defendant's Memorandum at 5, 10; meeting the demands of the election calendar, Defendant's Memorandum at 8-9; and requiring political parties to nominate their candidates via primary elections, Defendant's Memorandum at 5-6. These state interests, defendant argues, render the ballot access restrictions imposed by Directive 2007-09 "reasonable" and "nondiscriminatory," Defendant's Memorandum at 4. As set forth below, plaintiffs disagree.

### A. REDUCING ELECTION- AND CAMPAIGN-RELATED DISORDER

While this is undoubtedly a valid state interest, defendant fails to explain what sort of disorder is anticipated or how its reduction might justify the impairment of plaintiffs First Amendment rights. As an unexplained abstraction, this state interest cannot justify the burden which Directive 2007-09 imposes on plaintiffs' rights.

### B. REQUIRING A SIGNIFICANT SHOWING OF SUPPORT

It is a matter of public record that plaintiff LPO was founded in 1972, Amended Complaint, ¶ 8, has attained qualified-party ballot status in Ohio in the past, and has over the years fielded multiple candidacies for public office. The Libertarian Party's candidate for president, plaintiff Barr, has already attained access to the general election ballot in some 31

3

states.  See the July 1, 2008 edition of "Ballot Access News" at www.ballot-access.org.  By defendant's reckoning, representatives of plaintiff LPO tendered some 6,545 petition signatures on March 3, 2008 in an attempt to qualify the party for the November 2008 Ohio ballot. Amended Complaint, Ex. B.  In other cases where courts have determined that state ballot access frameworks are unconstitutional, non-major party candidates seeking access to the ballot have not been required to file any petition signatures whatsoever.  See the cases cited in plaintiffs' principal memorandum at 3.

These facts, plaintiffs submit, demonstrate that the LPO has a significant modicum of popular support.

### C. MEETING THE DEMANDS OF THE ELECTION CALENDAR

Plaintiffs have no quarrel with the state's need to accomplish the various pre-primary election tasks described in Defendant's Memorandum at 8-9.  However, defendant's claim that the need to accomplish these tasks justifies impairing plaintiffs' First Amendment rights simply begs the question of whether the state can legitimately require the LPO to select its candidates at the March primary election and to file its qualifying petition in November of the year preceding the general election.  In light of Blackwell, the state's choices would appear to be holding its presidential-election-year primaries on a significantly later date; retaining its early primaries for major parties and holding separate, significantly later primaries for qualified minor parties that wish to nominate their candidates later in the election season; or permitting minor parties to select their candidates at party conventions or caucuses rather than at primary elections.

### D. REQUIRING PARTIES TO NOMINATE VIA PRIMARY ELECTION

California Democratic Party v. Jones, 530 U.S. 567, 572 (2000) held unconstitutional a California proposition that changed the state's primary election from a closed primary to a

4

"blanket primary" in which a voter could vote for any candidate irrespective of the voter's or candidate's party affiliation, where the political party-plaintiffs did not want nonmembers to participate in the selection of their candidates.  In dictum, the Jones Court suggested that states can require parties to nominate by primary.

It does not follow that every primary election format is constitutional.  The Jones court pointed out that "we have continually stressed that when States regulate parties' internal processes they must act within limits imposed by the Constitution," Id. at 573.  Jones itself is an example; where parties did not want nonmembers to participate in the selection of their candidates, California's blanket primary exceeded the constitutional limits to which the Court referred.  An earlier case in which the state's primary election format exceeded those limits is Smith v. Allwright, 321 U.S. 649 (1944) (invalidating the Texas Democratic Party's "whites only" primaries).

Ohio's March primary, which forces minor parties to select their candidates eight months before the general election, is unconstitutional for the same reasons that Ohio's early filing deadline for minor party qualifying petitions is unconstitutional.  Like the early deadline, the early primary prevents new candidacies and new political coalitions from emerging in response to political developments that occur later in the election cycle.  For example, if a nonmajor party organization and its supporters are dissatisfied with the candidates selected by the major parties at the March primary, they ought to have an opportunity to qualify as an alternative political party and select alternative candidates to run in the general election under the party's label.  Ohio, however, denies them this opportunity without any legitimate state interest in doing so.  As a result, voters who are associated with or are in sympathy with such alternative political organizations are deprived of the opportunity to vote for candidates who express their political

5

views.

For the same reasons that a minor party must be permitted to submit a qualifying petition later in the election cycle, it must also be permitted to nominate its candidates later in the cycle if it wishes to do so.  While a March primary apparently suits the needs of the major parties, it is burdensome to the LPO.  In recognition of the different circumstances and needs of major and minor candidacies and parties, the Supreme Court stated in <u>Jenness v. Fortson</u>, 403 U.S. 431, 442 (1971) that "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike."

If Ohio continues to require minor parties to nominate by primary, and continues to tether the filing deadline for minor party qualifying petitions to the date of its primary, then it must either reschedule the primary election in presidential election years to a date that is substantially later than the present March primary date or hold a separate primary election at a later date for qualified minor parties.

### III.   BARR'S AND ROOT'S CLAIMS ARE RIPE

Defendant argues that Barr's and Root's claims are untimely because Directive 2007-09 gives them the option of qualifying to be listed on the November ballot, with a party identifier, by filing a petition containing 20,114 signatures 80 days before the November election.  Defendant's Memorandum at 3.  (Brown and Root could also qualify under Ohio Rev. Code § 3513.257(A) to be listed on the ballot, without a party identifier, by filing 5,000 signatures.)  However, plaintiffs seek not merely to qualify Barr and Root for the November ballot but to qualify the LPO to be listed on the ballot along with all of its nominees for public office.  In short, they seek *political party* status for the LPO.  Having Barr and Root on the ballot is no substitute for having the LPO and all of its candidates on the ballot.

6

In addition, the Sixth Circuit, like most courts, has stated that election challenges should be filed as early as possible and not on the eve of an election. See, e.g., Blankenship v. Blackwell, 429 F.3d 254, 258 (6th Cir. 2005) ("There is simply no excuse for Appellants' waiting more than seven months to bring their declaratory judgment claim and leaving the federal courts less than a month before the election to resolve it.") The plaintiffs' challenge to defendant's Directive is thus clearly ripe for this reason also.

## IV. DEFENDANT LACKS POWER UNDER OHIO LAW TO REGULATE FEDERAL ELECTIONS

Defendant cites Whitman v. Hamilton County Board of Elections, 778 N.E.2d 32 (Ohio 2002) for the proposition that she has "great discretion ... to regulate elections via directive." Defendant's Memorandum at 13. Whitman, however, merely states that Ohio courts have a "duty to defer to the Secretary of State's interpretation of election law if it is subject to two different, but equally reasonable, interpretations." Id. at 35-36. Defendant cites no authority for the proposition that she has the power to write election laws, let alone that she has the authority to regulate federal elections. She fails to explain why the Ohio Attorney General's 1930 opinion that the Secretary of State only has "discretion ... as chief election officer" to fill in "details which [the Legislature] cannot foresee," and in no case "amplify" the law, see 1930 Ohio A.G. Op. 120, 122-23, discussed in Plaintiffs' Memorandum at 16-17, is no longer valid.

## V. DEFENDANT'S RULES FOR NONMAJOR PARTY PRESIDENTIAL CANDIDATES ARE UNCONSTITUTIONAL

Assuming that defendant has the authority under Ohio law to write election laws, her attempt at regulating presidential elections is unconstitutional.

### A. THE DEADLINE FOR PRESIDENTIAL CANDIDATES VIOLATES ARTICLE II

Three Justices in Bush v. Gore, 531 U.S. 98 (2000) (the Chief Justice and Justices Scalia

7

and Thomas) concluded that Article II's delegation of power to state "Legislatures" prohibits state courts from writing federal election laws.  Two Justices in California Democratic Party v. Jones, supra, (Justices Stevens and Ginsburg) concluded that Article I's delegation to state "Legislatures" likely prevents states from regulating federal elections through referenda and initiative.  Thus, at least five of the nine Justices sitting on the Court in 2000 believed that the federal Elections Clauses found in Articles I and II require *legislative* action.  Justices Stevens and Ginsburg did not join in the Chief Justice's concurring opinion in Bush v. Gore only because they believed the Florida Supreme Court was properly interpreting the Florida legislature's election laws.  Had an agency sought to write a new law, as defendant has done here, Justices Stevens and Ginsburg (as reflected in their opinion in Jones) would certainly have objected.

 Plaintiffs concede that precedent on the meaning of the Article I and II Election Clauses is scant.  This is due in large part to the fact that few states have attempted to regulate federal elections through administrative action.  Still, even in the absence of definitive precedent, defendant's attempt can only be understood as exceeding her constitutional authority.

 First, as argued in plaintiffs' principal memorandum, it is clear that the Constitution's reference to "Legislature" in Article V's Amendment Clause has a judicially enforceable, federal meaning.  The Supreme Court has found that Article V precludes the use of popular initiatives, see Hawke v. Smith, 253 U.S. 221 (1920), and gubernatorial vetoes, see Smiley v. Holm, 285 U.S. 355 (1932), and quite likely prohibits the participation of state executive officials in the legislature's deliberative process.  See Coleman v. Miller, 307 U.S. 433 (1939) (Court evenly divides over whether a lieutenant governor can cast a tie-breaking vote in the state senate).

 Although Articles I and II remain less developed, the Supreme Court's use of the Seventeenth Amendment's necessity in Hawke, as well as the Chief Justice's and Justices Stevens,

8

Scalia, Thomas and Ginsburg's reliance on Articles I and II in Bush v. Gore and California Democratic Party v. Jones, prove that those Articles' references to "Legislature" have judicially enforceable, federal meanings.  Properly understood, those Articles' references to "Legislature" can only mean that a state agency cannot write federal election laws.  Defendant's August 18 deadline for presidential candidates thus violates Article II.

  **B.** **DEFENDANT'S AUGUST 18 DEADLINE VIOLATES THE FIRST AMENDMENT**

Assuming that defendant has the power to issue deadlines for presidential candidates, and has constitutionally exercised it within the meaning of Article II, her August 18, 2008 deadline still violates Barr's, Root's and the Libertarian Party of Ohio's First Amendment rights.  Because Barr and Root could qualify as independent candidates *without a party identifier* that same day by presenting a vastly smaller number of signatures – 5000 to be exact, Ohio Rev. Code § 3513.257(A) – the Directive can only be understood as an effort to deprive them of their party's endorsement.  Why else would Ohio require four times the number of signatures for a presidential candidate to be listed on the ballot with a party's label?

Ordinarily the justification for requiring more signatures is that a qualified party runs multiple candidates.  But that is not the case under the defendant's Directive.  Assuming the August 18 deadline is met, the Libertarian Party can run only its presidential and vice presidential candidates.  Defendant's measure, which requires four times the number of signatures in order to run under a minor party's banner, can only be understood as an effort to discourage minor party participation in Ohio's elections.  It is designed not to facilitate an orderly election, but to protect the major parties from minor-party competition.  Defendant knows that "the lack of a party label hurts a minor party candidate."  Richard Winger, "Ballot Format: Must Candidates Be Treated Equally?," 45 Cleve. St. L. Rev. 87, 97 (1997); Rosen v. Brown, 970 F.2d 169, 176 (6th Cir.

9

1992) (observing that party labels and "voting cues" provided to the major parties "make[] it virtually impossible for Independent candidates to prevail in the general election").  And her Directive seems to be designed with that thought in mind.

      Plaintiffs do not make this charge lightly.  History is on their side.  The Sixth Circuit in Rosen v. Brown, supra, which struck down an Ohio law barring minor candidates from using the "Independent" label, observed that Ohio's rationalization for the measure was "somewhat specious."   In reality, Ohio's distinction was "nothing more than a deliberate attempt by the State to protect and guarantee the success of the Democratic and Republican parties."  Id.  The Court further observed that "in light of the history of Ohio election laws, the State's claim of compelling interest should be viewed with skepticism." Id. at 177.  Similar sentiments were expressed in Libertarian Party of Ohio v. Blackwell, supra.

      Defendant's Directive must be viewed with equal skepticism.  If it were a matter of allowing a party's slate of candidates to run, her 20,000+ signature requirement might be justifiable.  Because this is not the case here (the only question is whether Barr and Root will run under the "Libertarian" banner), requiring four times as many signatures cannot be explained as anything but an effort to marginalize their candidacy.  This is a far cry from a compelling, important or even legitimate state interest.

      As noted by the Supreme Court in Cook v. Gralike, 531 U.S. 510, 523 (2001), "the Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints."  Even assuming that defendant has the power to regulate presidential elections under Article II, she thus cannot attempt to influence electoral outcomes by discouraging party candidates from running under their party's label.  At

bare minimum, Ohio must offer some neutral explanation for why Barr and Root can run as independents by submitting 5000 signatures, but may run with a "Libertarian" identifier only by submitting 15,000+ additional signatures on the same date.

"[A] party's defining act is the selection of a candidate and advocacy of that candidate's election by conferring upon him the party's endorsement." Washington State Grange v. Washington State Republican Party, 128 S.Ct. 1184, 1197-98 (2008) (Scalia, J., dissenting). Restrictions on this defining act must be justified by neutral principles; they must be crafted to either insure seriousness, deter frivolous candidacies, foster political stability, or minimize voter confusion. See, e.g., Arkansas Educational Television Commission v. Forbes, 523 U.S. 666 (1998) (holding that publicly owned television station may exclude candidates who were not "serious" from debate). As observed by Justice Stevens in Clingman v. Beaver, 125 S. Ct. 2029, 2048 (2005) (Stevens, J., dissenting) (upholding Oklahoma's semi-closed primary statute), "States do not have a valid interest in manipulating the outcome of elections, in protecting the major parties from competition, or in stunting the growth of new parties." While these remarks were offered in dissent, it seems clear that they encompass the view of a majority of Justices.[1] The Court, after all, has ruled on several occasions that government has no "power to dictate electoral outcomes." U.S. Term Limits v. Thornton, 514 U.S. at 833-34. See also Cook v.

---

[1] Justice Stevens was joined by Justices Souter and Ginsberg. 125 S.Ct. at 2047. Justice O'Connor's concurring opinion, which was joined by Justice Breyer, similarly explained that a state's "asserted interests [in restricting the ballot] [cannot be] merely a pretext for exclusionary or anticompetitive restrictions." Id. at 2045. There is no reason to believe, moreover, that any of the other justices would accept the claim that a state has a legitimate interest in preventing competition. Justice Thomas in Clingman relied on Oklahoma's interests in "preserv[ing] the political parties as viable and identifiable interest groups," id. at 2039, protecting parties' "precious resources," id. at 2040, minimizing voter confusion, id., and preventing party raiding. Id. None of these translates to preventing competition in the general election. If it did, "[if] ... States were able to protect the incumbent parties in the name of protecting the stability of the two-party system in general, we might still have the Federalists, the Anti-federalists, or the Whigs." 125 S.Ct. at 2052 n. 7 (Stevens, J., dissenting).

11

Gralike, 531 U.S. 510 (2001) (holding that government cannot use pejorative labels to describe candidates on its ballots, in part, because government has no power to dictate electoral outcomes).

Government has no business excluding a candidate's party label from the official ballot *because it wants to protect the major parties.* Nor does government have any constitutional business excluding a candidate's affiliation with a minor party *because of his potential impact on the outcome of the general election.* After all, that is what candidacies are designed to do – impact electoral outcomes.

### C. DEFENDANT'S DEADLINE FOR PRESIDENTIAL CANDIDATES CANNOT BE SAVED

Even assuming that a *uniform* August 18 filing deadline would be constitutional – that is, it would survive the First Amendment and Elections Clauses – defendant's special deadline and signature-collection requirements for presidential candidates must still fall. As argued in the Plaintiffs' initial brief, defendant's November deadline for minor-party qualification is clearly unconstitutional under Libertarian Party of Ohio v. Blackwell. Upholding her August deadline and signature requirement for nonmajor parties' presidential candidates would mean that presidential candidates in Ohio suffer stiffer regulations than any other candidate for statewide office. Rescuing defendant's rules for presidential candidates would then result in discrimination against minor party campaigns for presidential office.

This result would contradict Anderson v. Celebrezze, 460 U.S. 780, 794-95 (1983), which ruled that states have less power and room to regulate presidential elections: "[I]n a Presidential election a State's enforcement of more stringent ballot access requirements ... has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential

elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries."

Because the Democratic and Republican Parties, moreover, would not be subject to this same restriction – their candidates automatically qualify for the presidential ballot – rescuing defendant's rules for presidential candidates would subject minor parties to discriminatory treatment that would raise its own set of serious constitutional questions.  See, e.g., Fulani v. Krivanek, 973 F.3d 1539 (11th Cir. 1992) (holding that Florida law discriminating against minor parties was unconstitutional).

Of course, these problems might be avoided by carefully redacting the offensive portions of defendant's Directive, severing her presidential rules, and possibly rewriting them to ease their discriminatory applications; but none of this falls within the proper role of a federal court.  Federal courts rarely fix unconstitutional state laws.  The Supreme Court has said on numerous occasions that "it is clearly not this Court's province to rewrite a state statute."  Wyoming v. Oklahoma, 502 U.S. 437, 460 (1992).

The Sixth Circuit in Eubanks v. Wilkinson, 937 F.2d 1118, 1122 (6th Cir. 1991), recognized that "the general federal rule is that courts do not rewrite statutes to create constitutionality."  The Court observed that this is especially true with state statutes: "This Circuit has adhered to the principle that a federal court 'has very limited powers in construing state statutes or municipal ordinances.'"  Id. at 1123.  Rather, "a federal court must take the state statute or municipal ordinance as written and cannot find the statute or ordinance constitutional on the basis of a limiting construction supplied by it rather than a state court."

13

The defendant's Directive, then, must be taken as found. And as it is written, it is unjustifiable and unconstitutional.

### D. PLAINTIFFS SHOULD BE GIVEN ACCESS TO THE BALLOT

The Court has the authority, without any further actions by plaintiffs to comply with Ohio's ballot access requirements, to order that defendant grant plaintiffs access to the November ballot. Plaintiffs have tendered 6,545 petition signatures, Complaint, Ex. B, as but one indication of the public support they enjoy. In similar circumstances, courts have granted ballot access to nonmajor party candidates without requiring them to file any petition signatures whatsoever. See, e.g., McCarthy v. Briscoe, 429 U.S. 1317 (1976);; McCarthy v. Askew, 540 F.2d 1254 (5th Cir. 1976); McCarthy v. Slater, 553 P.2d 489 (Sup. Ct. Okla. 1976); Goldman-Frankie v. Austin, 727 F.2d 603 (6th Cir. 1984); Hall v. Austin, 495 F. Supp. 782 (E.D. Mich. 1980).

### CONCLUSION

For the foregoing reasons the Court is requested to enter a preliminary injunction granting the plaintiffs access to the November 4, 2008 general election ballot and invalidating the ballot access restrictions in Directive 2007-09 about which the plaintiffs complain.

Dated: July 10, 2008

    Respectfully submitted,

    Gary Sinawski
    180 Montague Street 26th Floor
    Brooklyn, NY 11201
    Telephone: (516) 971-7783
    Telefax: (212) 581-1516
    E-mail: gsinawski@aol.com

s/*Mark Brown*
Mark Brown, Trial Attorney
Ohio Registration No. 0081941
303 East Broad Street
Columbus, OH 43215
Telephone: (614) 236-6590
Telefax: (614) 236-6956
E-mail: mbrown@law.capital.edu

Attorneys for Plaintiffs